

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
|  | : |  |
| v. | : |  |
|  | : | NO. 5:08-cr-00553-LDD |
| ARGENIS URENA | : |  |

FILED
APR 15 2009
MICHAEL E. KUNZ, Clerk
By ______ Dep. Clerk

Legrome D. Davis, J. April 15, 2009

MEMORANDUM

Presently before the Court are Defendant's Motion to Suppress Physical Evidence, Statements, and Identifications (Doc. No. 29), Defendant's Motion in Limine to Exclude Evidence of Prior Convictions Pursuant to Federal Rule of Evidence 609 (Doc. No. 32), Defendant's Motion in Limine to Preclude Defendant's Statement under Rule 410 of the Federal Rules of Evidence (Doc. No. 35), the Government's Omnibus Opposition thereto (Doc. No. 37), the Government's Motion in Limine to Admit Evidence under Federal Rule of Evidence 609 (Doc. No. 36), Defendant's Supplemental Memorandum of Law in Support of Defendant's Motion in Limine to Preclude Defendant's Statement under Rule 410 of the Federal Rules of Evidence (Doc. No. 42), and the Government's Opposition to Defendant's Motion in Limine to Preclude Defendant's Statements (Doc. No. 43). For the reasons stated below, the Motions are resolved as follows:

1. Defendant's Motion to Suppress Physical Evidence, Statements, and Identifications (Doc. No. 29) is denied;

2. Defendant's Motion in Limine to Preclude Defendant's Statement under Rule 410 of the Federal Rules of Evidence (Doc. No. 35) is denied; and

3. Decision on Defendant's Motion in Limine to Exclude Evidence of Prior Convictions Pursuant to Federal Rule of Evidence 609 (Doc. No. 32) and the Government's Motion in Limine to Admit Evidence under Federal Rule of Evidence 609 (Doc. No. 36) is deferred until Defendant chooses to take the stand.

## I. FACTUAL FINDINGS

We make the following findings of fact from the record in this case. On March 23, 2007 at approximately 1:30 a.m., a man entered the Turkey Hill Mini Market ("Turkey Hill") located at 106 South Third Street in Coopersburg, Pennsylvania, and attempted to rob the clerk at gunpoint. Around that same time, Officer Gary Wisser ("Officer Wisser") was parked across the street from the Turkey Hill, engaged in speed timing traffic along Route 309, which is also known as South Third Street. (Suppression Hr'g N.T. 62:7-11, 63:2-8, Mar. 30, 2009.) While watching for speeding vehicles, Officer Wisser noticed a person exit the Turkey Hill and walk south towards shops and businesses that had been closed for hours. (Id. at 64:14-65:7.) Officer Wisser then decided to make an unrelated traffic stop and began to travel north along Route 309 in the opposite direction of the individual leaving the Turkey Hill. (Id. at 65:9-11.) Almost immediately after pulling out onto Route 309, Officer Wisser received a dispatch about an armed robbery of Turkey Hill and turned around. (Id. at 65:8-15.) The Turkey Hill is located on a block bordered by Route 309 to the east, East Station Road to the north, South Fourth Street to the west, and Thomas Street to the south. Officer Wisser decided to investigate the block surrounding the Turkey Hill. After making a U-turn on Route 309, he made a right onto East Station Avenue and dimmed his headlights. (Id. at 65:17-18, 67:4-5.) He then turned left onto South Fourth Street and noticed a minivan traveling west up Thomas Street. (Id. at 67:4-16.)

Besides the van, Officer Wisser did not see anyone else in the vicinity—no other vehicles

and no pedestrians. (Id. at 67:19-25.) He also knew that the minivan had come from the same direction as the individual he had seen exiting the Turkey Hill at the time of the robbery. (Id. at 87:4-7.) Officer Wisser began to follow the minivan. (Id. at 68:1.) From Thomas Street, the minivan turned left on Fourth Street and then right on Charles Street and finally right on Main Street. (Id. at 67:22-68:7.) Officer Wisser thought that the minivan's chosen path was odd since there were easier and more direct ways to get to Main Street. (Id. at 68:7-12, 88:21-89:15.)

After following the minivan to the intersection of Charles Street and Main Street, Officer Wisser decided that he had cause to make a traffic stop. (Id. at 68:19-24.) Officer Wisser told dispatch that he was not sure whether the minivan was involved in the armed robbery or not, but he wanted to make the stop. (Audio Defense Ex.) Before making the stop, Officer Wisser waited for backup. (N.T. at 69:1-2.) When backup arrived, Officer Wisser activated his lights and siren, and the minivan pulled over on Main Street. (Id. at 69:9-13.) Officer Wisser and another officer pulled up behind the minivan and exited their cars with their guns drawn and pointed toward the minivan. (Id. at 81:11-82:5, 82:11-23.) They ordered the driver to get out of the car. (Id. at 69:15-19.) At this point, Officer Wisser noticed the butt of a gun in the driver's waistband and ordered the driver to lie down in the road with his hands out to the side. (Id. at 69:19-25.) After handcuffing the driver and retrieving the gun from his pants, the officers identified the driver as Argenis Urena ("Urena"). They also removed a passenger, Urena's girlfriend named Harriett Crable ("Crable"), from the front seat of the minivan. While removing Crable, the officers noticed a camouflage jacket and black face mask between the driver and passenger seats, which were later identified by witnesses as the clothing worn by the robber. (Def.'s Mem. Supp. Mot. Suppress 2; Gov't's Omnibus Opp'n 5, 14.) A search warrant

eventually issued for the minivan, and a search produced two black knit wool caps, a burnt filter/screen often used to smoke crack cocaine, and a cell phone, in addition to the camouflage jacket and black face mask. (Gov't's Omnibus Opp'n 5, 14.) Urena was taken into custody. (N.T. at 12:9-17.)

Soon after news of the March 23, 2007 incident was reported, the Allentown police began to investigate Urena's role in similar robberies that had taken place in Allentown just days earlier. (Id. at 27:11-23.) Detective Glen Granitz, Jr. ("Detective Granitz") obtained a writ for the release of Urena on March 29, 2007 from Lehigh County Prison to the Allentown police headquarters in order to interview Urena about the other armed robbery incidents. (Id. at 29:19-23.) When Urena refused to sign the form advising him of his Miranda rights, Urena was transported back to prison. (Id. at 29:24-30:5.) Before leaving, Urena informed Detective Granitz that he did not mean to be rude but that he wanted to obtain a lawyer before talking. (Id. at 30:5-7.)

Following this encounter, several charges were filed against Urena. (Id. at 30:11-13.) On May 9, 2007, Urena was transported from Lehigh County Prison to Lehigh County District Court for arraignment on these charges. (Id. at 30:13-15.) Urena was then brought to the Allentown police station for processing, and he requested to speak to Detective Granitz. (Id. at 30:16-22.) Urena told Detective Granitz that he wanted to talk about the incident but that he wanted his attorney, Carmen Marinelli ("Marinelli"), to be present. (Id. at 31:1-3.) Detective Granitz responded that he would contact the District Attorney's Office to set up a meeting. (Id. at 31:6-7.) Urena reiterated the fact that he wanted his attorney to attend the meeting so that he could get a good deal. (Id. at 31:7-9.) Detective Granitz responded that he did not have anything to do

with making deals. (Id. at 31:11-12.)

Detective Granitz called Chief Deputy District Attorney, Bethany Zampogna ("Zampogna"), who in turn called Urena's lawyer, Marinelli. (Id. at 5:6-6:5.) Zampogna related to Marinelli that Urena wanted to speak to Detective Granitz but wanted his lawyer present at the meeting. (Id. at 7:5-9, 43:11-14.) There was no discussion of proffers or plea agreements or conditions. (Id. at 6:22-7:5, 44:17-45:3, 48:4-7, 58:18-59:21.) Zampogna, Marinelli, and Detective Granitz scheduled the meeting for May 23, 2007 at the District Attorney's Office. (Id. at 6:2-8, 31:15-19, 43:6-44:2.)

Marinelli then contacted his client to make sure he wanted to proceed with the meeting. (Id. at 43:15-23.) During this conversation, Marinelli told Urena that making a statement could be beneficial for him. (Id. at 48:10-13.) Marinella and Urena also met on May 23, 2007 before the meeting with Detective Granitz and Zampogna began. (Id. at 45:4-7.) Marinelli wanted to ensure that Urena wanted to make a statement, and Urena indicated that he did. (Id. at 52:20-53:2.) There was no discussion between Marinelli and Urena about negotiating a plea deal with Zampogna at this meeting. (Id. at 52:20-53:2, 58:22-59:2.)

As soon as the meeting commenced, Zampogna instructed Detective Granitz to read Urena his Miranda rights and have Urena fill out an advice of rights form. (Id. at 7:12-20.) Urena read and signed the form. (Id. at 7:19-20; Gov't Ex. 1.) Zampogna then asked Urena what he would like to say, and Urena responded by confessing not only to the robberies with which he had been charged but also to other robberies, some of which had never even been reported. (N.T. at 9:8-11, 20-24.) Urena explained that he was confessing to prevent his girlfriend, Crable, from being viewed as an accomplice and conspirator and also to get right by God. (Id. at 9:11-

18.) Although the Lehigh County District Attorney's Office had a proffer system in place for the negotiation of pleas, no proffers were offered in this case. (Id. at 7:3-9.) At no point before or during this meeting was there any discussion of plea agreements or conditions attached to Urena's confession. (Id. at 58:18-59:19; 112:2-5.) Rather, by confessing, Urena hoped that he would receive a favorable plea down the road. (Id. at 49:1-5, 106:18-23.)

After Urena confessed, he asked Zampogna what was going to happen to him. (Id. at 10:22-25.) She told him that it was too soon to tell. (Id. at 10:25-11:5.) Weeks later, after all charges against Urena had been filed, Zampogna did extend a plea offer to Marinelli at Urena's preliminary hearing in state court. (Id. at 15:22-17:1; Def. Ex. 1.) Urena never accepted this offer. (Id. at 17:3-9.)

## II. DISCUSSION

### A. Motion to Suppress Evidence Pursuant to the Exclusionary Rule

Defendant asserts that the seizure that occurred when Officer Wisser pulled over the minivan on March 23, 2007 amounted to a full-blown arrest. To support this assertion, Defendant points to the fact that the officers ordered Defendant out of the car with their guns drawn. Because Defendant claims that Officer Wisser lacked probable cause for this alleged arrest, Defendant states that all physical evidence recovered from this encounter as well as any identifications of such evidence by robbery witnesses should be suppressed as fruit of an illegal seizure.

A seizure results where an "officer, by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement through means intentionally applied." Brendlin v. California, 551 U.S. 249, 127 S. Ct. 2400, 2405 (2007) (internal citations and

emphasis omitted). "[A]n arrest that results in detention" and "an investigative stop that detains a citizen only momentarily" are two types of seizures. Gallo v. City of Philadelphia, 161 F.3d 217, 223 (3d Cir. 1998). A stop is "permissible when the police have a reasonable suspicion based on articulable facts that a crime has been committed." United States v. Edwards, 53 F.3d 616, 618 (3d Cir. 1995) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). An arrest, on the other hand, must be based on probable cause, a more stringent standard than reasonable suspicion. Maryland v. Pringle, 540 U.S. 366, 371 (2003).

The officers' conduct in pulling over the minivan and ordering the driver out of the car while in uniform with their lights and sirens activated and their guns drawn did not elevate the investigatory stop into a full-blown arrest. "[W]hen police officers make an investigative stop, they may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" Edwards, 53 F.3d at 619 (quoting United States v. Hensley, 469 U.S. 221 (1985)). In determining what is permissible during an investigatory stop, "the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." Baker v. Monroe Twp., 50 F.3d 1186, 1191 (3d Cir. 1995).

Applying this standard, we find the officers' actions to be reasonable under the circumstances of the stop. Officer Wisser followed and subsequently pulled over the minivan because he suspected that the driver of the minivan had been involved in the armed robbery of the Turkey Hill just minutes earlier. Knowing that they were responding to an armed robbery, Officer Wisser, as well as the other officers called as backup, had reason to believe that the driver

of the minivan was presently armed and dangerous. Moreover, the stop occurred on a deserted street in the early hours of the morning. The possible dangers associated with a stop of an individual suspected of armed robbery on a dark, deserted street created a great and reasonable need for the officers to protect themselves during the course of the investigatory stop. This need to ensure officer safety under these circumstances outweighs the burden placed on Defendant when the officers ordered him out of the car and pointed their guns in the direction of the minivan. Thus, the officers' actions constituted permissible protective measures during the course of the stop that did not amount to an arrest.

Defendant claims that the mere fact that a gun was drawn and pointed in the direction of the minivan transformed the stop into an arrest. However, the Third Circuit has held that "blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." Edwards, 53 F.3d at 619; see also Baker, 50 F.3d at 1191 ("There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest."). Rather, the use of guns during an investigatory stop "must be justified by the circumstances." Baker, 50 F.3d at 1191. As discussed above, we think that the police officers' conduct was reasonable and justified under the circumstances. Therefore, the display of weapons did not elevate the stop into an arrest.

Because the police officers did not execute a full arrest when they signaled for the minivan to pullover, Officer Wisser only needed reasonable suspicion to justify the stop. Reasonable suspicion requires a "'particularized and objective basis' for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Because reasonable suspicion is a

"commensense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," this standard is "not readily, or even usefully, reduced to a neat set of legal rules." Id. (quoting Illinois v. Gates, 462 U.S. 213, 231-32 (1983)). Reasonable suspicion requires more than a mere hunch, but does not rise to the level required for probable cause. United States v. Arvizu, 534 U.S. 266, 274 (2002). "In determining whether the reasonable suspicion standard is satisfied, a court must 'consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior.'" Couden v. Duffy, 446 F.3d 483, 494 (3d Cir. 2006) (quoting United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

At the time that Officer Wisser stopped Urena, he knew several things that gave him a reasonable ground to believe that the driver of the minivan had committed the armed robbery at the Turkey Hill. Officer Wisser had seen an individual leaving the Turkey Hill around the time of the robbery. He noticed that this particular individual walked from the entrance of the Turkey Hill toward several businesses that had been closed for hours. Seconds later, he received a dispatch notifying him that the Turkey Hill had been robbed. While circling the block around the Turkey Hill, Officer Wisser noticed that the streets were deserted. However, he spotted a minivan driving away from the Turkey Hill. He knew that the minivan was approaching from the direction that he had seen the individual leaving the Turkey Hill at the time of the robbery.

While following the minivan, Officer Wisser also noticed that the driver was taking an indirect route to get to the main road. We find that, looking at all of these facts together from the perspective of an experienced police officer with knowledge of the Coopersburg area, Officer Wisser had a reasonable suspicion to believe that the driver of the minivan was associated with the armed robbery at the Turkey Hill.[1]

Defendant asserts that Officer Wisser did not have a reasonable suspicion because he told dispatch that he was pulling over the minivan even though he admitted to not knowing whether the minivan was involved in the armed robbery. However, reasonable suspicion does not require knowledge or certainty, nor does it require proof beyond a reasonable doubt or even by a

---

[1] All of these facts would also amount to probable cause in the event that we found that the officers' conduct in pulling over the minivan constituted an arrest and not simply a stop. Like reasonable suspicion, the probable cause standard is "incapable of precise definition or quantification . . . because it deals with probabilities and depends on the totality of the circumstances." Pringle, 540 U.S. at 371. However, "the substance of all the definitions of probable cause is a reasonable ground for belief of guilt . . . [that is] particularized with respect to the person to be searched or seized." Id. The Supreme Court has stated that probable cause exists where "at the moment [of arrest,] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). In determining whether a police officer had probable cause to arrest an individual, we must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Pringle, 540 U.S. at 371 (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). The facts of this case establish that Officer Wisser had a reasonable belief that the driver of the minivan had just committed the reported armed robbery of the Turkey Hill. Not only was the minivan the sole sign of life on the road, but it was traveling from the direction in which Officer Wisser had seen an individual leave the Turkey Hill at the time of the robbery. Moreover, the minivan was taking a circuitous route to get to the main road, an indication to an experienced police officer that the driver was attempting to evade detection or suspicion. Thus, looking at these facts as part of our examination based on the totality of the circumstances, we believe that Officer Wisser had probable cause, in addition to reasonable suspicion, to conduct the stop.

preponderance of the evidence. Rather, reasonable suspicion is a question of what is reasonable under all of the circumstances, and as described above, we find that Officer Wisser had a reasonable basis for his belief that the driver of the minivan had just robbed the Turkey Hill.

Defendant also points to several facts that Officer Wisser did not know and argues that this lack of information prevented him from forming a reasonable suspicion. For example, Defendant states that Officer Wisser had no report that a vehicle was used to commit the robbery and no description of the suspect. There is no requirement though that these facts are necessary to form a reasonable suspicion or probable cause. We find that the facts that Officer Wisser did have at his disposal would enable an officer to reasonably suspect that the minivan was involved in the armed robbery.

Because we find that pulling over the minivan was a stop and not an arrest and because Officer Wisser had a reasonable suspicion that the driver of the minivan had just committed the armed robbery at the Turkey Hill, no violation of the Fourth Amendment resulted from the stop of Urena's minivan on March 23, 2007. As such, we will not exclude the evidence and identifications resulting from the stop.

B. Motion to Preclude Statement Pursuant to Federal Rule of Evidence 410

Defendant claims that the statements he made to Zampogna and Detective Granitz took place in the course of plea negotiations and therefore cannot be introduced as evidence pursuant to Federal Rule of Evidence 410 ("FRE 410"). FRE 410 states:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
> (1) a plea of guilty which was later withdrawn;

> (2) a plea of nolo contendere;
> (3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or
> (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Fed. R. Evid. 410. However, we find that FRE 410 does not apply because Defendant's statements were not made in the course of plea negotiations.

The Second Circuit addressed this issue in United States v. Levy, 578 F.2d 896 (2nd Cir. 1978). According to the Levy court:

> Plea bargaining implies an offer to plead guilty upon condition. The offer by the defendant must, in some way, express the hope that a concession to reduce the punishment will come to pass. A silent hope, if uncommunicated, gives the officer or prosecutor no chance to reject a confession he did not seek. A contrary rule would permit the accused to grant retrospectively to himself what is akin to a use immunity. Even statements voluntarily made after Miranda Warnings would be later objected to on the purported ground that they were made in anticipation of a guilty plea since reconsidered. A balanced system of criminal justice should not be made to function in such a swampy terrain. . . . The purpose [of Federal Rule of Criminal Procedure 11(e)(6)] can best be served if the accused is required, at least, to make manifest his intention to seek a plea bargain before he takes the route of self-incrimination.

Id. at 901. The Levy court acknowledged that there might be instances of de facto plea bargains that are less than formal but stated that it need not consider this possibility for the following reason:

> For Levy made his offers of cooperation and attendant admissions without attaching any condition to his admissions. The agents did not initiate the discussion. Rather, he volunteered to cooperate in the absence of any request from the agents. His decision to offer his cooperation was spontaneous, apparently based upon a successful prior experience of his own.

Id. (internal citations omitted). Similarly, other courts have found that a statement is made in the course of plea discussions if: (1) the suspect "exhibited an actual subjective expectation to negotiate a plea at the time of the discussion"; and (2) the suspect's "expectation was reasonable given the totality of the objective circumstances." United States v. Robertson, 582 F.2d 1356, 1366 (5th Cir. 1978); see also United States v. Leon Guerrero, 847 F.2d 1363, 1367 (9th Cir. 1988); United States v. Melina, 868 F. Supp. 1178, 1181 (D. Minn. 1994).

We find these approaches to be persuasive and applicable in the instant case. The meeting on May 23, 2007 attended by Urena, Zampogna, Marinelli, and Detective Granitz was initiated by Defendant. He may have hoped that his cooperation would be beneficial to him and result in a good deal in the form of favorable treatment by the District Attorney's Office. But a plea was not discussed either before or during the course of Defendant's statement. Defendant's subjective belief that his cooperation would lead to a good deal is not the same as a belief that one's confession is actually being given in exchange for a deal. Moreover, even if Defendant had a subjective belief that he was giving a statement in exchange for a plea deal, he did not communicate this belief to anyone either before or during the meeting, as recounted by Zampogna, Detective Granitz, and Marinelli. Rather, he expressly told those involved at the meeting that he wanted to confess in order to exculpate his girlfriend and to seek God's forgiveness.

Even assuming that Defendant exhibited this subjective belief, we do not think that such a belief was objectively reasonable under the circumstances. Defendant requested the meeting in order to confess. He told Detective Granitz that he wanted a good deal, but Detective Granitz responded that he did not have anything to do with that. Before Defendant made a statement, he

was read his Miranda rights. He signed a form, acknowledging that he understood that he had the right to remain silent and that anything he said could and would be used against him. Without establishing any conditions or engaging in any discussion about plea negotiations, Defendant made a statement. Neither Zampogna, Detective Granitz, or Marinelli mentioned the possibility of a plea agreement in exchange for his cooperation. In fact, although the Lehigh County District Attorney's Office had a proffer system in place, that system was not utilized here, indicating that plea negotiations were not contemplated by those involved. Defendant may have hoped that his confession would put him in a better position to receive a favorable plea deal down the road, but he could not have reasonably expected that his confession guaranteed one.

For these reasons, Defendant's confession was not made in the context of plea negotiations. Therefore, we will not preclude the introduction of these statements at trial.

C. Motion to Exclude Evidence Pursuant to Federal Rule of Evidence 609

Judgment on this motion will be deferred. If Defendant decides to take the stand to testify in his defense at trial, the Court will issue a ruling at that time.

III. CONCLUSION

Accordingly, Defendant's Motion to Suppress Physical Evidence, Statements, and Identifications (Doc. No. 29) and Defendant's Motion in Limine to Preclude Defendant's Statement under Rule 410 of the Federal Rules of Evidence (Doc. No. 35) are denied. Decision on Defendant's Motion in Limine to Exclude Evidence of Prior Convictions Pursuant to Federal Rule of Evidence 609 (Doc. No. 32) and the Government's Motion in Limine to Admit Evidence under Federal Rule of Evidence 609 (Doc. No. 36) is deferred until Defendant chooses to take the stand. An appropriate order follows.